# Exhibit A



null / ALL
**Transmittal Number: 26012289**
**Date Processed: 12/07/2022**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Eric T. Streck<br>Deloitte LLP<br>1221 Avenue of the Americas<br>New York, NY 10020-1001 |
| **Electronic copy provided to:** | Sierra Robart<br>Sarah Foley<br>Caroline Daniels<br>Pouneh Aravand<br>Mylynne Naron<br>Husna Kazmir<br>J. Aoun<br>Larry Garland |

| | |
|---|---|
| **Entity:** | Deloitte & Touche LLP<br>Entity ID Number  1709692 |
| **Entity Served:** | Deloitte & Touche LLP |
| **Title of Action:** | United States of America vs. Sivaraman Sambasivam |
| **Matter Name/ID:** | United States of America vs. Sivaraman Sambasivam (13308652) |
| **Document(s) Type:** | Subpoena |
| **Nature of Action:** | Information/Appearance Request |
| **Court/Agency:** | U.S. District Court Southern  District, WV |
| **Case/Reference No:** | 2:22-cr-00163-2 |
| **Jurisdiction Served:** | Delaware |
| **Date Served on CSC:** | 12/07/2022 |
| **Answer or Appearance Due:** | 12/20/2022 |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Dorsey & Whitney LLP<br>612-492-5077 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

A001



KATHERINE CHAVES
Associate
(612) 492-5077
chaves.katherine@dorsey.com

December 6, 2022

**_VIA MESSENGER_**

Deloitte & Touche LLP c/o
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

  Re: *United States v. Minkkinen et al.*, 22-cr-00163

Dear Sir or Madam:

  Pursuant to Federal Rule of Criminal Procedure 17, attached is a subpoena issued by the U.S. District Court for the Southern District of West Virginia in the above captioned matter. The subpoena requires the production of documents by December 20, 2022 at noon.

  We do not wish to be unduly burdensome to your organization and are available to discuss the categories of documents requested at your convenience. Should you wish to discuss, I can be reached at (612) 492-5077 or chaves.katherine@dorsey.com. Thank you in advance for your anticipated cooperation.

    Sincerely,

    DORSEY & WHITNEY LLP


    /s/ Katherine Chaves
    Katherine Chaves
    Associate

KMC:lak

Attachment

AO 89B (07/16) Subpoena to Produce Documents, Information, or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT
## for the
Southern District of West Virginia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Sivaraman Sambasivam | ) | Case No. 2:22-cr-00163-2 |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN A CRIMINAL CASE

To: Deloitte & Touche LLP c/o Corporation Service Company
251 Little Falls Drive, Wilmington, DE 19808

*(Name of person to whom this subpoena is directed)*

**YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following books, papers, documents, data, or other objects:

Please see Appendix A for a list of records. In lieu of appearing, you may produce a copy of the documents to the Clerk of the Courts for the Southern District of West Virginia at the following address.

| Place: Clerk, U.S. District Court, Southern District of WV<br>U.S. Courthouse, 300 Virginia Street, East, Room 2400<br>Charleston, WV 25301 | Date and Time: 12/20/2022 12:00 pm |
|---|---|

Certain provisions of Fed. R. Crim. P. 17 are attached, including Rule 17(c)(2), relating to your ability to file a motion to quash or modify the subpoena; Rule 17(d) and (e), which govern service of subpoenas; and Rule 17(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

*(SEAL)*

Date: 12/5/22

CLERK OF COURT

_Eugenia Berger_
Signature of Clerk or Deputy Clerk

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* ___Sivaraman Sambasivam___
___, who requests this subpoena, are:

Susan M. Robinson, Esquire, Thomas Combs & Spann, PLLC, 300 Summers Street, Suite 1380, P.O. Box 3824, Charleston, WV 25338; 304.414.1808; srobinson@tcspllc.com

### Notice to those who use this form to request a subpoena

Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Please note that Rule 17(c) (attached) provides that a subpoena for the production of certain information about a victim may not be issued unless first approved by separate court order.

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case  (Page 2)

Case No.  2:22-cr-00163-2

**PROOF OF SERVICE**

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

A004

## Federal Rule of Criminal Procedure 17 (c), (d), (e), and (g) (Effective 12/1/08)

**(c) Producing Documents and Objects.**

**(1)  In General.** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

**(2)  Quashing or Modifying the Subpoena.** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

**(3)  Subpoena for Personal or Confidential Information About a Victim.** After a complaint, indictment, or information is filed, a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

**(d)  Service.** A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance. The server need not tender the attendance fee or mileage allowance when the United States, a federal officer, or a federal agency has requested the subpoena.

**(e)  Place of Service.**

**(1)  In the United States.** A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States.

**(2)  In a Foreign Country.** If the witness is in a foreign country, 28 U.S.C. § 1783 governs the subpoena's service.

**(g)  Contempt.** The court (other than a magistrate judge) may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district. A magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. § 636(e).

To:     Deloitte & Touche LLP c/o Corporation Service Company
        251 Little Falls Drive
        Wilmington, DE 19808

### INSTRUCTIONS

1.      In order to comply fully with this Subpoena, you should produce all responsive documents that are in your possession, custody, or control as they are kept in the ordinary and usual course of business.

2.      You should resolve any perceived ambiguity in favor of the most complete disclosure, and you should describe what you feel is ambiguous and why, responding in the alternative where possible. To the extent it results in a more complete disclosure, the singular shall be construed to include the plural and vice versa, and the present tense shall be construed to include the past tense, and vice versa.

3.      Production is requested of documents in full, without abbreviation or expurgation. A copy of both sides of the requested documents shall be produced, unless the reverse side of the documents is completely blank. Any computerized data shall be produced both on disk in its native format and in printed form. If copies of the documents are produced, the copies must be identical to the original. For example, if a document contains multiple stapled, clipped, or otherwise collated pages, then the copy shall contain each attached page and be similarly collated. All documents shall be duplicated and attached to the copy in the exact manner and location as such items are appended to the original document

4.      Document(s) must be produced as you keep them in the ordinary course of business or organized and labeled to correspond with the categories demanded in this Subpoena. To the extent that requested documents are stored, located, or found in a particular container or receptacle, including a folder, binder, notebook, redwell, filing cabinet, or any such other

container or receptacle, a copy shall be made of the cover of the pertinent folder, binder, notebook, or filing cabinet label or of such other container or receptacle to indicate where the document was stored, kept, or located.

5.      If objection is made to disclosing the substance of any document or communication on the basis or any claim of privilege, you are requested to specify in writing the nature of such documents or communication, along with the privilege claimed.  Where applicable, you should state the following:

        a.      The title of the document;

        b.      The nature of the document (e.g. interoffice memorandum, correspondence, report, etc.);

        c.      The author(s) or sender(s) or parties to the communication

        d.      The addressee(s);

        e.      The date of the document or the communication;

        f.      The name of each person to whom the original or copy was shown or circulated;

        g.      The names appearing on any circulation list related to the document;

        h.      The basis on which the privilege is claimed; and

        i.      A summary statement of the subject matter of the document of the communication in sufficient detail to permit the Court to rule on the propriety of the objection.

6.      In the event that any requested document has been lost or destroyed, that document should be identified by indicating the date, subject matter, number of pages, originator, and all persons to whom it was distributed.  The date of loss or destruction, manner of loss or

destruction, reasons for destruction, person(s) authorizing destruction, person(s) losing or destroying the document, and custodian(s) of the document at the time of loss or destruction shall also be identified.

7.    These requests are continuing in nature and require further and supplemental production by you as if it is discovered that the responses were inaccurate or incomplete.

## DEFINITIONS

The following definitions shall apply to this Subpoena:

**"Communication"** shall mean any written, oral or electronic communication, including, but not limited to, letters, facsimiles, memoranda, electronic mail, telephone calls, voicemails, text messages, reports, notes, financial statements, budgets and checks.

**"Data"** shall mean transactional data processed by the unemployment insurance system.

**"DDL"** shall mean Data Definition Language.

**"Deloitte"** shall refer to Deloitte & Touche LLP, together with any of its respective agents, attorneys, employees, representatives, affiliated or predecessor entities (including, but not limited to, BearingPoint, Inc. and KPMG Consulting), or assigns.

**"Document"** and **"Documents"** shall mean any written, recorded or graphic matter or other means of preserving thought or expression however produced or reproduced and all tangible things from which information can be processed or transcribed including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, correspondence, memoranda, directives, notes, writings of every kind, nature and description, messages, text-messages, letters, address books, telegrams, teletype, telexes, telefax, bulletins, communications, records of telephone calls, diaries, chronological data, calendars, minutes, books, manuals, reports, records reflecting or pertaining to all communications of any kind, charts, brochures, pamphlets, ledgers, invoices, bills, work sheets,

3

trip reports, receipts, returns, data stored in computers, computer prints-outs, prospectuses, financial statements, tax returns, schedules, affidavits, contracts, applications, resumes, canceled checks, checkbooks, check stubs, transcripts, statistics, surveys, magazine or newspaper articles, advertisements, releases (any and all drafts, alterations and modifications, changes and amendments of any of the foregoing), and graphic or aural records or representations of any kind, including without limitation, all drawings, prints, sketches, photographs, charts, graphs, microfiche, microfilm, videotape, sound recordings, motion pictures, and any other form of electronic, mechanical or electrical recordings or representations of any kind, including without limitation, tapes, cassettes, discs, or reel-to-reel recordings.

**"ER Diagrams"** shall mean the Entity Relationship (ER) Diagrams used by Deloitte in its unemployment insurance systems.

**"Massachusetts QUEST Project"** shall mean the project stemming from the May 18, 2007 Statement of Work ("SOW") between the Massachusetts Department of Unemployment Assistance ("DUA") and BearingPoint, Inc. for the DUA Quality Unemployment System Transformation ("QUEST") Project. The SOW was executed on May 21, 2007 by Edward T. Malmborg, DUA Director, and Kathy Karich, Regional Managing Director of Bearing Point. The SOW was executed in response to a request for a quote ("RFQ") for the DUA Quest Project, also known as the DUA Quest 06-06 Solicitation dated June 21, 2006.

**"Minnesota DEED"** shall mean the Minnesota Department of Employment and Economic Development.

**"Minnesota UITIP Project"** shall mean the project stemming from any contract or statement of work between Minnesota DEED and Deloitte related to the Unemployment Insurance

4

Technology Initiative Project ("UITIP").  The UITIP project began in 2002 and was completed in June 30, 2008.

**"New Mexico Project"** shall mean the project stemming from the New Mexico Department of Workforce Solutions (NMDWS) Unemployment Insurance System Modernization, initiated in August 2009 and implementation starting in January 2013, and on which NMDWS contracted with Deloitte in January 2010.

**"State Workforce Agency"** shall mean any administrative department or division of any U.S. state, commonwealth or territory that is responsible for the implementation and management of the given state's, commonwealth's, or territory's unemployment insurance program.

**"Source Code"** shall mean the computer program expressed in a source or human readable language consisting of a full source language statement of the code and all other materials and documents necessary to enable a reasonably skilled programmer having knowledge of the functionality to maintain, amend and enhance the software in question without reference to any other person or document.

**"UI Vendor"** shall mean any private or public entity who works on Unemployment Insurance programs for any U.S. state or territory.

**"Use Case"** shall mean the methodologies used in Deloitte's unemployment insurance system analysis to identify, clarify, and organize its unemployment insurance system requirements. The Use Cases include the set of possible sequences of interactions between Deloitte's unemployment insurance system and users, as well as supplemental specifications for reports, work flow, correspondences, interfaces, and other design artifacts.

**"You"** or **"Your"**, as used herein, shall refer to Deloitte & Touche LLP, together with any of its respective agents, attorneys, employees, representatives, affiliated entities, or assigns.

A010

## DOCUMENTS TO BE PRODUCED

1. Produce Documents identifying where and how Deloitte stored its uFACTS related materials from the Massachusetts QUEST Project, specifically the Use Cases, Source Code, DDLs, and Data, as of August 2013.

2. Produce Documents identifying the programming language and the database software Deloitte used for the Massachusetts QUEST Project, as of August 2013.

3. Produce Documents confirming that Deloitte implemented a .Net version of the uFACTS solution at the Massachusetts QUEST Project, as of August 2013.

4. Produce the Use Cases, Source Code, DDLs, Data, and ER Diagrams, for the version of the uFACTS solution that was created for Massachusetts DUA during the Massachusetts QUEST Project, as of August 2013, or, if unavailable, the most recent version of the requested Documents in Deloitte's possession.

5. Produce Use Cases, Source Code, DDLs, Data, and ER Diagrams that were used as the basis for the New Mexico Project, and were in effect as of August 2013.

6. Produce Documents identifying where Deloitte stored its uFACTS related materials from the New Mexico Project, specifically the Use Cases, Source Code, DDLs, and ER Diagrams, as of August 2013.

7. Produce Deloitte's proposal submitted in response to the Minnesota UITIP Project RFP, including any sections that describe uFACTS functionality, screenshots, and other technical details.

8. Produce the Use Cases, Source Code, DDLs, Data, and ER Diagrams, for the version of the uFACTS solution that existed and were in effect immediately prior to the commencement of the Minnesota UITIP Project.

7

A011

9. Produce the Use Cases, Source Code, DDLs, Data, and ER Diagrams, for the version of the uFACTS solution that was created for Minnesota DEED during the Minnesota UITIP Project, as of August 2013, or, if unavailable, the most recent version of the requested Documents in Deloitte's possession.

10. Produce Documents identifying the programming language and the database software Deloitte used during the Minnesota UITIP Project, and were in effect as of August 2013.

11. Produce Documents showing the "reasonable steps" Deloitte took "to maintain the secrecy of its trade secrets, along with other associated confidential and proprietary information." *See* Ex. 1 at ¶ 1.  This requests encompasses Documents sufficient to show how Deloitte protects its documents, including but not limited to, uFACTS Source Code, Data, Use Cases, software designs, schema, logic, artifacts, and architecture, "from not being generally known to, and not being readily ascertainable through proper means by, the public." *See id.* at ¶ 1.

12. Produce Documents showing how uFACTS Source Code, Data, Use Cases, software designs, schema, logic, artifacts, and architecture confer a competitive advantage to Deloitte.

13. Produce Documents showing correspondence between Deloitte and the United States Department of Labor ("USDOL") regarding USDOL's requests to Deloitte to share its uFACTS Source Code, Data, Use Cases, software designs, schema, logic, artifacts, and architecture with other State Workforce Agencies or UI Vendors (the "Requests"), as well as Documents sufficient to show Deloitte complying with USDOL's Requests, from 2001 through the present.

8

14. Produce Documents showing Deloitte's receipt of unemployment insurance Source Code, Data, Use Cases, software design, schema, logic, artifacts, and architecture from either the USDOL, a State Workforce Agency, or a UI Vendor from 2001 through present.

15. Produce all responses, proposals, and bids, including any copies of redacted or "marked" responses, proposals, and bids indicating proposed redactions, that Deloitte has prepared and submitted in response to Requests for Proposals ("RPFs") or Requests for Information ("RFIs") regarding a State Workforce Agency's unemployment insurance modernization project and Deloitte's proposal to use its uFACTS solution, from 2001 through present.

16. Produce all Documents reflecting uFACTS Source Code, Data, Use Cases, software designs, schema, logic, artifacts, and architecture shared by Deloitte with a State Workforce Agency, from 2001 through present.

17. Produce Documents sufficient to show Deloitte's marketing materials for its unemployment insurance offerings and description of such offerings, including its uFACTS solution, from 2001 to present.

18. Produce all executed copies of agreements and amendments to agreements that Deloitte has entered into with a State Workforce Agency to implement Deloitte's uFACTS system as part of the State Workforce Agency's unemployment insurance modernization project, from 2001 to present.

19. Produce Documents between David Minkkinen and Deloitte's IT Department, including Mark Dion, regarding the transfer of files on Mr. Minkkinen's Deloitte laptop to an external hard drive, prior to Mr. Minkkinen's departure from Deloitte in June 2013.

9

20. Produce all Documents describing Communications or evincing Communications between Deloitte and (i) the offices of the United States Attorney of the Southern District of West Virginia and the United States Attorney of the Northern District of West Virginia (each, the "USAO"), including, but not limited to, Assistant United States Attorney Andrew Cogar; (ii) the United States Department of Labor – Office of Inspector General ("USDOL"), including, but not limited to, Joseph Harilla; or (iii) the West Virginia Commission on Special Investigations ("WVCSI"), including, but not limited to, Jim Powers, from 2013 to the present regarding Deloitte's allegations that Sivaraman Sambasivam, David Minkkinen and/or Sagitec Solutions, Inc. had misappropriated Deloitte's uFACTS source code, database, use cases, software designs, schema, logic, artifacts, and architecture (the "Allegations").

21. Produce all Documents provided to the USAO, USDOL, or the WVCSI concerning the Allegations, from 2013 to the present.

22. Produce all Documents that Scott Malm, Deloitte's Labor Workforce Development Leader, obtained from a confidential informant in connection with the Allegations, including those Documents to which Mr. Malm referred to in his interview on November 2, 2016 with Mr. Powers and Steve Staton from WVCSI. *See* Ex. 2 at 2-3.

23. Produce all Documents that Mr. Malm examined in connection with the Allegations, including those Documents that support his opinion that "none of the UI software product Deloitte has developed for various states falls within the public domain." *See* Ex. 2 at 3.

24. Produce all opinions and conclusions that Mr. Malm provided to the USAO, USDOL, and WVACSI in connection with the Allegations.

10

# Exhibit 1

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2022
AUGUST 23, 2022 SESSION**



FILED

AUG 2 3 2022

RORY PERRY, CLERK
U.S. District Court
Southern, District of West Virginia

**UNITED STATES OF AMERICA**

v.

**DAVID GERALD MINKKINEN and
SIVARAMAN SAMBASIVAM**

CRIMINAL NO. 2:22 - cr - 00163

18 U.S.C. § 1832(a)(5)
18 U.S.C. § 1832(a)(3)
18 U.S.C. § 1343
18 U.S.C. § 1001(a)(3)
18 U.S.C. § 1001(a)(2)
18 U.S.C. § 2

# I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

### Introductory Allegations

*Subject Trade Secrets*

1.      Deloitte is an international company that provides various financial and advisory

services, including unemployment claims management services.  Deloitte uses a proprietary web-

based software platform named Unemployment Framework for Automated Claim & Tax Services

("uFACTS") to process unemployment insurance claims for state agencies.  At all relevant times,

Deloitte considered the uFACTS source code, database, use cases, software designs, schema, logic,

artifacts, and architecture to be trade secrets. Deloitte took reasonable steps to maintain the secrecy

of its trade secrets, along with other associated confidential and proprietary information.  In

addition, Deloitte's trade secrets and confidential and proprietary information derive independent

economic value from not being generally known to, and not being readily ascertainable through

1

A016

proper means by, the public.

*Sagitec and Defendant Employees*

2.      Sagitec Solutions, LLC ("Sagitec") is a global "technology solutions" company headquartered in Saint Paul, Minnesota.  Founded in 2004, Sagitec provides a variety of information technology products to private and public institutions.

3.      In 2013, Sagitec launched its Unemployment Insurance ("UI") practice.  Between June 2013 and December 2015, at least eleven Deloitte employees left Deloitte to work for Sagitec, including defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM**. At all relevant times, defendant **DAVID GERALD MINKKINEN** was a senior partner at Sagitec overseeing its UI practice, and defendant **SIVARAMAN SAMBASIVAM** was a senior partner at Sagitec overseeing client service delivery for the UI practice.

4.      Before joining Sagitec, defendant **DAVID GERALD MINKKINEN** was the UI Practice Leader at Deloitte from May 2009 to June 2013, and defendant **SIVARAMAN SAMBASIVAM** was employed by Deloitte from April 2009 until September 2013, serving as the lead system architect for the uFACTS Solution Framework.  Pursuant to their employment agreements with Deloitte, defendant **DAVID GERALD MINKKINEN**, defendant **SIVARAMAN SAMBASIVAM**, and other prior Deloitte employee-co-conspirators promised to not disclose any Deloitte trade secrets or any other confidential information, and they agreed to return any such information to Deloitte when they separated from the company.

*Trade Secret Theft*

5.      Both before and after their departure from Deloitte, defendants **DAVID GERALD MINKKINEN** and **SIVARAMAN SAMBASIVAM** copied, downloaded, obtained, and transmitted numerous Deloitte files, including trade secret information such as uFACTS source

2

A017

code, data, and use cases, without authorization and in violation of their Deloitte employment contracts. These files were subsequently used by numerous Sagitec employees to design, develop, and market Sagitec's UI software, known as "Neosurance."

*The Consortium Unemployment Insurance Project*

6.      In 2015, Sagitec won a bid to design, develop, and implement a replacement software system to process UI benefit claims, taxes, and appeals in the states of Maryland and West Virginia. The project was funded by federal grants from the United States Department of Labor.

7.      The Maryland-West Virginia Consortium ("Consortium") contract with Sagitec provided, in pertinent part, that Sagitec "represent[ed], warrant[ed], and covenant[ed]" that its "Work Product, the Software, and the System shall not infringe or otherwise violate any intellectual property or other proprietary rights of a third party." Defendant **DAVID GERALD MINKKINEN** signed the contract on behalf of Sagitec, and served as the primary point of contact for the project. The Consortium contract indicated that Sagitec would be paid between $49,195,338 and $70,631,145 for its services. To date, more than $100 million has been expended on the project.

8.      Workforce West Virginia ("Workforce WV") is a state government agency funded through the United States Department of Labor that oversees the state unemployment insurance program and a network of workforce development services. Workforce WV was the state's implementing agency for Sagitec's UI product and thus worked with Sagitec and other subcontractors to develop and install the new UI software platform. Workforce WV employees worked on the UI project in offices in Charleston, Clarksburg, and Morgantown, among other locations in the state, where they often remotely collaborated with Sagitec employees in Maryland

A018

and elsewhere.

## The Conspiracy

9.    From in or about July 2013 to in or about June 2021, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendant **DAVID GERALD MINKKINEN,** defendant **SIVARAMAN SAMBASIVAM,** and other Sagitec employees, knowingly conspired to commit offenses in violation of 18 U.S.C. § 1832 (a)(1), (2), and (3). That is, the conspirators, with the intent to convert a trade secret, that was related to a product and service used in and intended for use in interstate and foreign commerce, to the economic benefit of Sagitec and persons who did not own the trade secrets, and knowing and intending that the offense would injure the owner of the trade secrets, knowingly conspired to:

- Steal and without authorization appropriate, take, conceal, and by fraud, artifice, and deception obtain trade secrets from the owner of the trade secrets, Deloitte;

- Without authorization copy, duplicate, download, upload, transmit, communicate, and convey trade secrets owned by Deloitte; and

- Receive and possess trade secrets owned by Deloitte, knowing the same to have been stolen, appropriated, obtained, and converted without authorization.

### Overt Acts

10.    In furtherance of the conspiracy, and to accomplish its objectives, defendant **DAVID GERALD MINKKINEN,** defendant **SIVARAMAN SAMBASIVAM,** and the other conspirators committed the following overt acts, among others, in the Southern District of West Virginia and elsewhere:

a)    From approximately January 2016 until at least on or about April 8, 2019, defendant **DAVID GERALD MINKKINEN** and the other conspirators maintained and

A019

constructively possessed material containing and derived from Deloitte's trade secrets on computers and servers that belonged to Workforce WV, and which were located in Charleston, Kanawha County, West Virginia.

b)    On or about September 14, 2017, defendant **DAVID GERALD MINKKINEN** sent an email to investigating agents that was designed to conceal and misrepresent the ongoing possession, transmission, and use of Deloitte's trade secrets by defendant **DAVID GERALD MINKKINEN**, the other conspirators, and Sagitec.

c)    On or about October 1, 2020, in a recorded interview with an investigating agent in Charleston, Kanawha County, West Virginia, defendant **DAVID GERALD MINKKINEN** made material misrepresentations about Sagitec's acquisition, possession, and use of Deloitte's trade secrets.

d)    On or about March 12, 2021, in a recorded interview with an investigating agent in Charleston, Kanawha County, West Virginia, defendant **SIVARAMAN SAMBASIVAM** made material misrepresentations about Sagitec's acquisition, possession, and use of Deloitte's trade secrets.

In violation of Title 18, United States Code, Section 1832(a)(5).

5

## COUNT TWO

11.     Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

12.     From in or about 2015 until at least on or about April 8, 2019, at or near Charleston, Kanahwa County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendants **DAVID GERALD MINKKINEN and SIVARAMAN SAMBASIVAM**, with intent to convert a trade secret that was related to a product and service used in and intended for use in interstate and foreign commerce, for the economic benefit of another and others, other than the trade secret's owner, and knowingly and intending that the offense will injure any owner of the trade secret, knowingly possessed, and aided, abetted, counseled, commanded, induced, procured, and willfully caused the possession, of trade secret information owned by Deloitte, knowing the same to have been stolen, appropriated, obtained, and converted without authorization.

In violation of Title 18, United States Code, Sections 1832(a)(3) and 2.

6

A021

## COUNT THREE

13.     Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

14.     From on or about September 17, 2015, until or about April 8, 2019, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere, defendant **DAVID GERALD MINKKINEN**, devised and intended to devise a scheme and artifice to defraud the Maryland-West Virginia Consortium to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

*The Scheme to Defraud*

It was part of the scheme to defraud that:

15.     Defendant **DAVID GERALD MINKKINEN** obtained, transmitted, and used various forms of Deloitte intellectual property without authorization, including, but not limited to, copyrighted materials and trade secrets associated with uFACTS.

16.     Defendant **DAVID GERALD MINKKINEN** knowingly facilitated and approved the use of Deloitte intellectual property to design, develop, and market Sagitec's UI software product.

17.     In Sagitec's contract with the Consortium, defendant **DAVID GERALD MINKKINEN** falsely affirmed that Sagitec's UI software product would not infringe third party intellectual property rights.

18.     Defendant **DAVID GERALD MINKKINEN** thereafter repeatedly concealed and misrepresented Sagitec's possession and use of Deloitte intellectual property.

19.     On or about September 14, 2017, for the purpose of executing, and attempting to execute, and conceal the scheme to defraud the Maryland-West Virginia Consortium, and for

7

A022

obtaining money and property, defendant **DAVID GERALD MINKKINEN** transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds, that is, he transmitted an email from the state of Minnesota to investigators in West Virginia and Virginia, which falsely denied any possession or misappropriation of Deloitte intellectual property.

In violation of Title 18, United States Code, Section 1343.

8

## COUNT FOUR

20.     Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

21.     On or about September 14, 2017, defendant **DAVID GERALD MINKKINEN** sent an unsolicited email to the investigative agents in this case. In the email, defendant **DAVID GERALD MINKKINEN** claimed, among other things, that "an individual in West Virginia" "made certain unfounded claims regarding Sagitec's software and services," which "were thoroughly vetted with consortium project leadership and the Maryland Attorney General."

22.     Defendant **DAVID GERALD MINKKINEN** attached three documents to the September 14, 2017 email: two letters addressed to the Maryland Office of the Attorney General ("OAG") dated August 23, 2016, and January 15, 2017, which were responses to inquiries by the Maryland OAG about alleged misappropriation of intellectual property by Sagitec, and a January 25, 2017 letter from the Maryland OAG, which indicated that the inquiry was "closed" based on the information provided by defendant **DAVID GERALD MINKKINEN**.

23.     On or about September 14, 2017, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in an email attachment dated August 23, 2016 that "[c]ertainly the allegation that Sagitec has in any way misappropriated another party's property is defamatory." The statement and representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Sagitec had, in fact, misappropriated Deloitte's intellectual property.

In violation of Title 18, United States Code, Section 1001(a)(3).

9

A024

## COUNT FIVE

24.     Paragraphs one through eight, 21 and 22 are incorporated herein by reference as if repeated and re-alleged in full.

25.     On or about September 14, 2017, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in an email attachment dated January 15, 2017, that "Sagitec has not obtained copies of any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client." The statement and representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Sagitec had, in fact, obtained copies of the Deloitte uFACTS source code and tangible software artifacts along with data tables, documentation, deliverables, and other works of authorship authored by Deloitte.

In violation of Title 18, United States Code, Section 1001(a)(3).

10

## COUNT SIX

26.    Paragraphs one through eight, 21 and 22 are incorporated herein by reference as if repeated and re-alleged in full.

27.    On or about September 14, 2017, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN** willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating in an email attachment dated January 15, 2017, that "Sagitec has not incorporated any software, source code, or any other tangible software artifacts authored by Deloitte, a Deloitte subcontractor or consultant, or a Deloitte client into anything delivered to the MW Consortium." The statement and representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Sagitec had, in fact, directly incorporated Deloitte uFACTS use cases and data into the MW Consortium.

In violation of Title 18, United States Code, Section 1001(a)(3).

11

## COUNT SEVEN

28.    Paragraphs one through eight incorporated herein by reference as if repeated and re-alleged in full.

29.    On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is: when asked whether he brought anything from Deloitte when he came to Sagitec, defendant **DAVID GERALD MINKKINEN** responded "No, and . . . that's entirely false." This representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he in fact took Deloitte's intellectual property with him when he started his employment at Sagitec.

In violation of Title 18, United States Code, Section 1001(a)(2).

12

A027

## **COUNT EIGHT**

30.        Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

31.        On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating that "[T]here's nothing in [Sagitec's] product [that] had any similarity to Deloitte whatsoever." This representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Sagitec's Neosurance product had several functional and technical similarities with Deloitte's uFACTS product.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT NINE

32.        Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

33.        On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating that "I can assure you both that there was nothing of Deloitte technology that was used in [Sagitec's] solution, period." This representation was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, Deloitte technology, including software code and data tables, was incorporated in Sagitec's Neosurance product and used for its development.

In violation of Title 18, United States Code, Section 1001(a)(2).

14

A029

## COUNT TEN

34.    Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

35.    On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, when asked if he left Deloitte with Deloitte use cases or similar material, defendant **DAVID GERALD MINKKINEN** responded that "No, no, and it wouldn't even be useful. Like if I took the [Deloitte] use case from New Mexico it wouldn't even be useful . . ., because they're, like I said, 30 percent different state by state. . . . [I]t wouldn't even make sense." These statements were false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he took use cases from a Deloitte project in Massachusetts, transmitted them to Sagitec employees, and knew that they were used to develop Sagitec's Neosurance product.

In violation of Title 18, United States Code, Section 1001(a)(2).

15

### COUNT ELEVEN

36.     Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

37.     On or about October 1, 2020, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **DAVID GERALD MINKKINEN**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, by stating that "If somebody was using the [Deloitte] use case from another state I'm not aware of it . . . ." This statement was false because, as defendant **DAVID GERALD MINKKINEN** then and there knew, he took use cases from a Deloitte project in Massachusetts, transmitted them to Sagitec employees, and knew that they were used to develop Sagitec's Neosurance product.

In violation of Title 18, United States Code, Section 1001(a)(2).

16

A031

## COUNT TWELVE

38.    Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

39.    On or about March 12, 2021, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **SIVARAMAN SAMBASIVAM**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is: When asked if he was "aware of whether any [former Deloitte employees who joined Sagitec] took Deloitte's intellectual property when they left Deloitte," **SIVARAMAN SAMBASIVAM** stated that "[I]t's hard for me to say whether they took it or not. . . . David [Minkkinen] has had some material, that I know of, some proposal material. I don't know if that's considered as intellectual property or not, but I've seen that." This statement was false because, as defendant **SIVARAMAN SAMBASIVAM** then and there knew, David Minkkinen obtained uFACTS source code and use cases from Deloitte's Massachusetts project, which **SIVARAMAN SAMBASIVAM** fully understood to be Deloitte's intellectual property.

In violation of Title 18, United States Code, Section 1001(a)(2).

17

A032

## COUNT THIRTEEN

40.    Paragraphs one through eight are incorporated herein by reference as if repeated and re-alleged in full.

41.    On or about March 12, 2021, in Kanawha County, West Virginia, within the Southern District of West Virginia, defendant **SIVARAMAN SAMBASIVAM**, during a recorded interview with a federal agent, willfully and knowingly made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is: When asked if he took Deloitte "materials," **SIVARAMAN SAMBASIVAM** stated that "No, I did not." This statement was false because, as defendant **SIVARAMAN SAMBASIVAM** then and there knew, he took uFACTS data tables from Deloitte's Massachusetts project, along with other Deloitte documents and files.

In violation of Title 18, United States Code, Section 1001(a)(2).

UNITED STATES OF AMERICA

WILLIAM S. THOMPSON
United States Attorney

By:  _____
Andrew R. Cogar
Special Assistant United States Attorney

Candina Heath, Senior Counsel
Department of Justice
Computer Crimes and Intellectual Property
Section

18

A033

# Exhibit 2



**West Virginia Legislature
Commission on Special Investigations**

**Memorandum of Interview**

| | |
|---|---|
| **In RE:** | Work Force WV – US DOL Grant |
| **Case No.:** | 2173-16 |
| **Date of Event:** | November 3, 2016 |
| **Participants:** | Annica Jin-Hendel, Assistant General Counsel, Deloitte LLP, New York, NY<br>Telephone: 212-492-3857<br>Jaclyn Fink, Chief Intellectual Property Strategist General Counsel, Deloitte LLP, San Francisco, CA<br>Telephone: 415-783-5691<br>Scott Malm, Private Sector Workforce & Employment Leader, Deloitte LLP, Minneapolis, MN<br>Telephone: 651-246-5075<br>Steve Staton, Senior Investigator, CSI<br>Jim Powers, Deputy Director, CSI |
| **Subject:** | Conference Call re WorkForce WV Software Vendor Sagitec |

On Monday, October 31, 2016, the Undersigned received an e-mail message from ANNICA JIN-HENDEL inquiring if the Investigators were available for a conference call. This call was scheduled for Wednesday, November 2, 2016 at 3:00 PM.

The call took place as scheduled, with the above named individuals present and participating in the call. It is noted this was essentially the first meaningful communication from Deloitte since the initial conference call on August 5, 2016, and that the call involved the same group of participants, absent the CI, who was present for the first call.

Ms. JIN-HENDEL asked if there had been any developments since the last conference call. The Undersigned responded by providing information summarized as follows:

1) That an attempt had been made in early October to reach out to the State of Maryland, which resulted in a conference call with two attorneys from the Maryland Attorney General's office (JESSICA CARTER and one other) on October 5, 2016.
2) That at the onset of this call the Undersigned stated it was his impression CARTER had been provided a copy of the original letter from the CI in West Virginia, dating to June of this year and raising concerns about the project.

Page 1 of 4

A035

3) That CARTER and the second attorney (DANA REED) declined to respond as to whether they had seen the letter without first speaking to their client.

4) That the Investigators had provided CARTER and REED the same general information about concerns regarding Sagitec and the Maryland/West Virginia (hereafter MD/WV) Consortium Project as had been provided to Deloitte two months earlier.

5) That the Investigators had been transparent with the Maryland attorneys, disclosing that they had previously reached out to Deloitte, as well the United States Attorney's office, and providing the names and telephone numbers of the individuals contacted.

6) That the Maryland attorneys seem to be holding the Investigators at "arm's length" for some unidentified reason, and that the only real information they had provided was copies of RFP and contract documents for the MD/WV project which fall within the public domain. It was noted these documents include relatively extensive redactions.

Aside from the above, the Undersigned also informed those on the call from Deloitte that additional evidence had been provided by the CI indicating that contrary to the contract terms, there is project development work occurring at a Sagitec office in India.

The Investigators then asked questions of the Deloitte group, with the responses from Deloitte coming almost exclusively from SCOTT MALM, who is clearly the one of the three most knowledgeable of Deloitte's unemployment insurance (hereafter UI) software product.

1) Deloitte was asked if they submitted a proposal for the MD/WV project. MALM stated they did not.

2) Deloitte was next asked if the Maryland attorneys had reached out to them. They stated there has been no contact from the Maryland attorneys.

3) The Undersigned pointed out the Investigators are clear that the Massachusetts and Minnesota UI software projects are Deloitte product, and asked if similar projects in New Mexico and Montana were Deloitte projects/product as well. MALM stated they were.

The Undersigned then pointed out that based upon the content of the Sagitec proposal to the MD/WV Consortium, it appears Sagitec is taking credit for project work by Deloitte in the above states, but phrasing same as the expertise of Sagitec's "project team", with this team consisting of a group of former Deloitte personnel who left Deloitte for Sagitec in the fall and winter of 2013.

The Undersigned further pointed out that a review of Sagitec's listing of actual projects completed reveals that virtually all their completed work consists of software projects for various retirement systems, and that the only UI software project cited in the proposal which is truly theirs is one for the District of Columbia, which occurred after the key players left Deloitte.

Page **2** of **4**

MALM stated the above is correct, and the District of Columbia project is Sagitec's only real venture into the UI software realm to date. During this conversation MALM made it clear he is in possession of a copy of Sagitec's proposal for the MD/WV project, and is fully aware of their claims with respect to what is in reality Deloitte's product and projects.

Given this, the Undersigned asked MALM to explain the licensing arrangements with the various states where Deloitte has completed UI software development projects, and whether any of their product was "public domain" such that the personnel who left Deloitte for Sagitec could have (legally) taken a copy of Deloitte's work product with them.

MALM stated without hesitation that none of the UI software product Deloitte has developed for various states falls within the public domain. He stated Deloitte has been very careful to protect its ownership rights in the work product in question, and its agreements with the various states are such that the states have no ownership rights in the software developed for them. Deloitte grants the state/customer a license to use the software in perpetuity, but does not grant the states any right to share the software product with others.

MALM stated that since the initial conversation on August 5th, he has examined the material obtained from the CI closely, and it is clear the Sagitec product being developed for the MD/WV Consortium is based upon a foundation of software development work and product developed by Deloitte for the other states, which is the intellectual property of Deloitte. He stated it is clear the MD/WV project began with a copy of Deloitte's product, and while new data fields have been added, there has been no attempt to hide the fact the starting point is a copy of Deloitte's work. (*The preceding is the Undersigned's layman's explanation of the considerably more technical explanation articulated by SCOTT MALM.*)

Having reached this point in the conversation, Ms. JIN-HENDEL turned to next steps, and suggested the need to compare Deloitte's product with the Sagitec product. She made mention of potentially reaching out to the attorney's in Maryland to establish some type of non-disclosure agreement.

After a short conversation between the Investigators, off the telephone, it was suggested the matter was now at an apparently critical point, and that the Investigators felt the need to solicit AUSA ANDREW COGAR's advice before proceeding any further. When asked, JIN-HENDEL stated Deloitte is agreeable to bringing the US Attorney into the situation now that Deloitte has reached the conclusions outlined above. It was agreed the Investigators would reach out to Deloitte as soon as they had been able to confer with AUSA COGAR.

Shortly after the call concluded, Investigator's STATON and POWERS spoke by telephone with AUSA COGAR, and reviewed the above information with him. It was agreed the next best step would be to essentially repeat the conference call of this date with AUSA COGAR participating as well, which would place him in a posture of discussing evidentiary needs, etc., directly with the attorneys from Deloitte.

The Undersigned transmitted an e-mail message to Ms. JIN-HENDEL later this same date requesting a conference call to occur the coming week, with all the same parties participating, but with AUSA COGAR participating as well.

JSP:lmw
2016-11-03

Page **4** of **4**

A038